Call the next case, National Security v. Iola. Good morning. May it please the Court, I'd like to reserve three minutes for rebuttal, This case raises issues of ERISA preemption and the scope of liability under Harris Trust. The backdrop is four single-employer ERISA plans participating in what's supposed to be a retirement plan. They're told that the plan involves a trustee, separate funds, guaranteed benefits. And what they find out, in fact, is that there is no separate fund with respect to their contributions. And the program, of course, is one where there is group term life insurance provided to all employees and then approximately 80 percent of the contributions are supposed to go into a fund that is set aside to pay post-retirement benefits to the company owners. And what we find, of course, is that all of those contributions, 100 percent, are used to pay insurance premiums and that the insurance company, the insurance companies in this case, do not have reserve funds. They're accepting those premiums into their general assets. And their position with respect to these very complex policies referred to as secret policies is that there is no entitlement to conversion credits and there's no entitlement to conversion credits in any particular amount. And indeed, one group of plaintiffs, defender plaintiffs, when they go to convert, when they're forced to bail out of the plan because of a tax audit, they go to get those conversion policies, which are supposed to have significant cash value. They're told no. We only have 15 minutes here, so maybe we should skip the background. Okay, the Renfro case came down and you didn't really have an opportunity to address it. So can you tell that, since we're dealing with a suit against a non-fiduciary now, Mr. Barrett, how that fits in here? In particular, do we get it right in Renfro? You did get it right, but for reasons unrelated to Harris Trust. Renfro, I think the basis for the holding, Your Honor, is that there is no knowing participation. The Court comments in discussing the other fiduciary issues in Renfro that Fidelity did not knowingly participate. Indeed, the plaintiffs in that case conceded that Fidelity was unaware it was happening in terms of the investments. In terms of comments in footnote six to Renfro about the scope of Harris Trust liability, I don't think that is correct, either in terms of Harris Trust or in terms of this Court's prior decision in Rice v. Compton. For example, Rice v. Compton specifically held that liability under 502A can go beyond parties and interests. And despite that, footnote six seems to indicate that you can only have liability for parties and interests participating in prohibited transactions. So I think that aspect of Renfro is incorrect. I would also note that Harris. But it's important in this case if it's applied, right? It is, Your Honor. And I think we have to go back to Harris Trust. Did you sue Mr. Barrett because he was a party and interest in a prohibited transaction under 106A, 1106A? We did, Your Honor. We sued on a variety of grounds. And, of course, one of the challenges in these cases is that you don't always know what the status of a particular party is when you start. So when we sued him, we sued in the alternative. We sued under state law, claiming he's a state law fiduciary. We sued in the alternative that he might be a fiduciary in ERISA or that he might be assisting. He might be a party and interest or he might be assisting fiduciaries in violation. I thought the district court construed your action as under 1106B, and you didn't do anything to disabuse the district court of that. Your Honor, we asserted claims under 404, which is the loyalty and prudence standard, as well as under 406 generally. And there's no question that the district court could have found that Barrett violated 406A, which deals with prohibited transactions in parties and interests. 406A1D specifically prohibits a fiduciary from participating or using planned assets in a transaction that benefits a party and interest. So that would be an alternative grounds if Harris Trust were limited to 406A. But we pursued 404. The district court found against us, we think, misinterpreting the duties there. The district court relied upon a finding that the planned documents did not characterize the benefits in a particular way. That, in our perspective, was not the claim. We also, of course, pursued claims under 404B1 and 3. And the only claim upon which the district court found in our favor was 404B3. But if you go back to Harris Trust, Harris Trust is very specific in saying that liability for knowingly participating in a fiduciary breach is not limited to parties and interests. And, indeed, we have this language that is quoted in many, many cases to the effect that the universe of defendants is not limited in any way under 502A3. That's consistent, by the way, with the holding of this Court in Wright v. Compton. Do you limit Harris Trust's liability to 406A? We submit that you don't. Even though Harris Trust involved a claim under 406A, the reasoning goes beyond that. And, indeed, the district court in this case, we submit, properly held that Harris Trust's liability goes beyond 406A, and that's what most of the courts have held in interpreting it. Can you touch on the preemption issue and specifically where the district court went wrong? Your Honor, the preemption issue in two respects. ERISA preemption does not apply at all with respect to any preplanned representations, representations to induce parties to create or participate in ERISA plan. And all of the representations at issue in this case, guaranteed benefits, reserve fund, trustee, the nondisclosure commissions, all of those were made ahead of time. So, certainly, with respect to the preplanned misrepresentations, you can't limit us. Now, Barrett is the only remaining defendant in the case. That's correct, Your Honor. So we're talking about his misrepresentation. And Barrett, of course, is the financial planner who is working on an active basis all four of the plaintiffs, in many cases, not just with respect to this. He has an ongoing relationship. But we also have this Court's decision in Coleman where this Court held that preemption does not generally apply when you're dealing with claims made by plans, by planned fiduciaries against non-fiduciaries. Was he a planned fiduciary at the time that the representations were made? He was not, Your Honor. And that was specifically found in the state court litigation, one case of which became part of this. We have two consolidated cases. And the court below here also specifically found. What were the misrepresentations, the extent to which the premiums would be put? Your Honor, the misrepresentations were that there was a reserve fund that would hold 80 percent of the contributions, that there was a trustee that was overseeing that fund, that the benefits were guaranteed. And, indeed, the representative from the insurance company said, nothing is guaranteed about this. We have sole discretion. And then the final misrepresentation is the omission to disclose the nature and amount of the commissions. And all of those claims are precluded on the basis of preemption? No, Your Honor. The district court ruled that we could. Well, yes, they were. And, of course, there was the misrepresentation about the tax benefits. Barrett is specifically advising these people that you can deduct the contributions. But everything up until that, the fund, the guarantee, yes, the district court held that those claims were preempted under state law. And I would just note that, of course, we had the Finder and Alloy decision out of the Appellate Division, where that court had the benefit of the Department of Labor's involvement. You're saying it's the law of the case. We say it's the law of the case. Yes, Your Honor. Does the law of the case bind a state court determination in the federal court? Your Honor, one of those cases, the Alloy case, was removed to this court, removed to the district court. And we submit that, yes, it should. It should or it does? Well, it does, Your Honor. Well, it's discretionary, isn't it? Isn't it a discretionary? Yes, I was going to say subject to the general law on the law of the case, which is discretionary. But we would submit, particularly in light of Coleman, that there's no reason under ERISA that any of those claims should have been preempted. Did the district judge address that issue and say, well, I'll reject it or in my discretion I'll accept it? Obviously, she didn't accept the state court proceedings decision. Your Honor, she was not explicit about it. The argument made by Barrett's counsel is that we had added some additional claims. Was she asked to accept it? Yes, Your Honor. We did argue the law of the case below. So, again, we submit that Harris Trust does reach all the claims here and that under Harris, under ERISA, that the district court should have found additional violations, as I mentioned before. What is your strongest claim? You have so many claims on appeal, so many contentions. And I'm wondering, if you had your druthers, which one would you want to prevail on? I'd like to go back and be able to try the RICO case as the kickback case as we presented it. And I think one of our strongest arguments is that the district court erred as a matter of law in dismissing the commission aspect under Rule 58, and that there was abundant evidence in the record that the commissions here were excessive. They were not disclosed. We had Department of Labor Regulations 8424. There's nothing wrong with having high commissions. I mean, you can pretty much take whatever commissions you want. There's nothing wrong with that, is there? Well, absolutely there is, Your Honor. Was it the extent of the commission, or was it the failure to disclose what was being done with the commissions? It was the failure to disclose the amount and extent of the commissions. We have commissions, Your Honor, that are being basically 100 percent of contributions that, in some cases, are $100,000 a year. And in the case of two of the plaintiff groups, those first-year commissions, 100 percent effectively, were taken out in two years. I thought the testimony was that this front-loading of commissions was standard in the industry and you didn't put on rebuttal testimony. Your Honor, the insurance company said yes. When we have insurance policies like that, we take that out. But that goes back to the misrepresentations about the nature of the program. Our people were never told that 100 percent of the contributions are going to pay insurance premiums. They're being told that 80 percent are going into a reserve fund. Is it a misrepresentation or a failure to disclose? In other words, did Barrett have the responsibility to say, or did he say, we're going to use these premiums in order to fund the reserve program? That's what he said, Your Honor. Or he failed to say that? He said that the contributions are going to fund the reserve fund 80 percent. He never disclosed that any of the reserve fund payments, the 80 percent, would be paid to commissions. And this goes back to the nature, the entire nature of the plan. These people think it's a retirement program. You put your hard-earned money into a retirement program, you expect it to be there. So, in fact, nothing was put in that program? No reserve fund. It turned out there was no reserve fund. The money goes from the plaintiffs to the trustee. The trustee, we find out later, was nothing more than a pass-through. At Tricor's direction, Tricor the fiduciary, the trustee sends. Speaking of Tricor, I couldn't understand the district court's allocation of the verdict. I can't remember the amount, but she assessed 50 percent. I guess she cut the baby in half, I suppose. It was the jury. It was the jury. It was the jury. A jury, but was it based on instructions of the court? It was, and we submit that those instructions were deeply flawed. Tricor is a stranger to these plaintiffs. They're just out there promoting a plan, and all their materials say, don't rely upon us with respect to the tax benefits. So what was the rationale? Was Tricor on the verdict sheet, and it was 50-50? Is that it? Well, actually what happened is the case got split in half. She bifurcated the issue of allocations. We got our verdict against Barrett, and then over our objection, we then came back and had a separate hearing on the issue of allocation, not just with respect to Tricor, but with other defendants. We objected to that, A, because there was no legal basis for arguing that Tricor had a duty to disclose before it became an erisa fiduciary. This goes back to one of the preemption issues. And also that there was no factual basis for that to happen. And we, in fact, the district court commented several times, Mr. Fram, I don't think you need to worry about that too much, suggesting that the allocation wouldn't be significant. Supposing you were right and the instruction was given and the entire verdict were in your favor, you wouldn't have any grounds to appeal the jury verdict. I wouldn't have grounds to appeal that aspect of the jury verdict. We would still press our argument that we're entitled to a new trial with respect to RICO. Your Honor, the relief available under RICO goes well beyond that. And, of course, part of the consequence of the preemption ruling on state law is that we were limited in the damages we could recover. We couldn't recover the commissions that were diverted. So we submit, and I see my time is up, but we submit that we're entitled to a new trial both on the issue of damages and on RICO if this court determines that there should have been no allocation. The predicate acts for the RICO were the commission, omission of information about the commissions. And the other predicate act was? Your Honor, the predicate acts technically were the mailings. It was mail fraud, wire fraud. All based on the commissions? No, not all based on the commissions, Your Honor. They were based upon numerous letters that made misrepresentations about a wide variety of things. Everything I mentioned before, the funds. So everything was in except that you believe the district judge's instruction on the commissions took that out of the case, and that would have made a difference? Yeah, not only instructions on the commission. We also asked for instructions that Tricor was a fiduciary and had duties to disclose the accurate information and had a duty to disclose the commission. We asked for similar instructions with respect to Barrett under state law. And as I think you know from mail and wire fraud cases, the issue of whether the defendant has an affirmative duty to disclose if they're a fiduciary is hugely important when you're trying these cases to juries. Can I ask you one other thing? You have part of your appeals about the disgorgement remedy. What's our standard of review there? Is it abuse of discretion? I think that's a matter of law, Your Honor. I think the Supreme Court cases and all the equity cases, including the restitution, the restatement of restitution, made clear that as a matter of law that disgorgement has to be full, that you don't give the defendant credit with respect to reasonable compensation or anything else. So on that, we submit that there was no discretion. It was an issue of law. Okay. Thank you very much. Please report. Is it Mr. Leese? Yes, Your Honor. Christopher Leese for Mr. Barrett. We do have a cross appeal which has been already referred to. I'm going to try and focus on the questions that the Court has raised to this point in the argument. There's a lot before us here today. With regard to the commissions and the RICO claims, the RICO case went to the jury. There's been no objection to the judge's charge on the RICO claims. That was rejected. I'm sorry. Did you say there was no objection to the? I'm sorry. The basic charge under RICO, the charge under RICO, is not at issue here. And, Your Honor, you had raised the issue of the commissions. We were trying both cases at the same time. Clearly, part of the ERISA case was the claim for disgorgement of commissions against more than one party here, including the absent fiduciary. There was plenty of evidence before this jury about the commissions, as you know from our brief. The trial was replete. But he's arguing that the judge charged out of the jury's consideration the commissions as a basis for them finding mail fraud, et cetera. And that was a ruling that the judge made under the rules of evidence, in my view, in looking at the record. In other words. Does it matter if the judge says, I mean, if the judge says, oh, by the way, you cannot consider the statements about commissions in deciding whether there's fraud. Yes, Your Honor. As if she made a mistake. It was correct because there was no evidence, direct, indirect, or otherwise, that there was anything wrong with the commissions. In fact, all of the evidence from their expert. Excuse me. I'm sorry. That's a different issue. If the testimony was these were reasonable commissions is one thing. If the RICO claim is that there was fraud because there was a duty disclosed and it wasn't disclosed, was the jury told they couldn't consider that? I don't think the judge got into it in that much detail. Let me just point out something else about the commissions. What did you tell the jury, I'll take care of the commissions, you don't worry about them? Because it was part of the ERISA case. I know, but didn't that send a message to the jury in the RICO case that they shouldn't consider any nondisclosures about commissions? Wasn't that a big message she sent to the jury? The plaintiffs did not pay the commissions. As you know from the record, Commonwealth, the insurance company, paid the commissions. The plan did not pay the commissions. The commissions were paid separate and apart from the basic commercial transaction, which underlied this case, which was a group insurance policy. They were huge, weren't they? Weren't the parties you just mentioned merely conduits? They were paid commissions by the insurance company. Yes, the commissions. Okay. This is a RICO case we're talking about now. That's where you started. Right. Okay. Mr. Barrett knows about the commissions. Okay. And the question is, what was Mr. Barrett's role in failing to disclose the commissions? Did he have any duty to disclose it? And she told the jury not to consider that. I believe she said that. I think Her Honor, Judge Thompson, at that point had heard the evidence, knew that the plaintiffs didn't pay the commissions, therefore they had no claim for the commissions. They did not pay the commissions. The evidence was uncontroverted that Commonwealth paid the commissions and that the payment of the commissions was separate and apart from the life insurance. In other words, the plan received all of the benefits to which it was entitled. Okay. So your view is the judge made a ruling that the commissions were not part of the RICO case and the jury was not to consider any agreements about the commissions or nondisclosures about the commissions. Plus, of course, there was also evidence of disclosure. Each of the plaintiffs testified they knew Mr. Barrett was being paid a commission. Was that a yes to my question? Yes. The jury was told just don't bother with it. It's not part of the RICO case. And then the judge went on, Your Honor, to cover that in the ERISA case. And your answer to that is it doesn't matter because it wouldn't have been a successful RICO claim. Is that your answer to that? No. Is it harmless error? I don't know what you're saying. The judge took the RICO, the commissions out of the RICO case. We agree on that? Yes, Your Honor. Okay. Are you saying that wasn't an important error? No. Because it would have been unsuccessful? I don't know what you're saying about it. I'm saying it was correct based on the evidence at trial, including the testimony of the plaintiffs. The judge went on in her non-jury ERISA decision to give considerable review to all of the evidence with regard to the commissions, and it's in her findings of fact. She found as fact that the plaintiffs ---- Aren't there two different things, whether the commissions were reasonable or whether they were not disclosed and, therefore, were part of some fraud? It's two different issues, isn't it? Yes, Your Honor. It could be. But, again, I want to emphasize that the plaintiffs knew there were commissions. And the judge found as fact, sitting in the same courtroom with the same witnesses and assessing them, that they did not rely, that the plaintiffs were not, the business owners were not relying on the commissions, didn't care about the commissions. She found that as fact. What they cared about were the tax benefits. But, of course, in fact, because of the extent of the commissions, the reserve program was not being funded, which is one of the things that the plaintiff wanted most. Your Honor, with all due respect ---- Basically a conversion of insurance into a retirement program. Well, this now goes into the ERISA decision by Judge Thompson. Judge Thompson found as fact ---- You're talking about the commissions, and the point is that they were so huge that if the plaintiff had known that the commissions were not being used to fund the reserve program, they wouldn't have bought into this program at all. Well, there's two parts to that. There was no evidence that the commissions had any detrimental impact on the program. And the judge emphasized that in her decision. The evidence was that the ----  I don't respectfully, Your Honor, know because Paula Jackson from the insurance company testified, plaintiff's insurance expert testified, that the range of commission here, which, by the way, was 50 percent for Mr. Barrett in the first year and then reduced down to 6 percent in the second year, was standard in the industry. He was receiving reasonable compensation. The judge found as a fact, as fact, based on the plaintiff's own testimony, that they knew he was being paid a commission. Therefore, if they knew he was being paid a commission, and the evidence was uncontradicted that the compensation was ---- I'm sorry. I know that he knew that they were ---- Barrett was being paid a commission. It was the extent of the commissions that they were very troubled about. And if they had known that, this is their contention. If they had known about that, they wouldn't have been involved in these programs. Well ---- Have I got that wrong? I thought that the essence of Judge Thompson's decision was that she felt that evidence could be prejudicial. She felt it was more properly allocated, Your Honors, to the ERISA case, where it was fully considered as part of that case. After all, the ---- What was the ERISA case? Under what section was this ERISA case? Can I just mention again that the commissions were not part of the damages in the jury trial case. Okay? They were not part of the damages. That was all in the ERISA case. The ERISA case, as Your Honor mentioned previously, I thought focused on 1106B. It seemed to. I mean, it seems to me they started out with general claims. But by the time you got to the end, I'm not sure there was anything left but 1106B. Well, I mean, we know how the court ruled. The court ruled that Barrett was entitled to reasonable compensation. Part of her findings, in fact, were that the commissions were standard in the industry. And, therefore, she held, as you know, under B, that the fiduciary receiving commissions from Commonwealth, not from the plan, from Commonwealth, that's important, was a per se violation. And then she found participation liability before the Renfro case came down. So that gets us back to the Renfro case, which was decided by this court in August. I understand it's a published decision. I understand it's a published decision. And under that decision, the court found that there is no participation liability under that section of ERISA. Which section? 1106B. Okay. Under B. Now, so the question is, they started this case with 1104 and 1106A and 1106 generally. And so the question is, was, and the judge didn't go that way. So the question was, did they preserve their claims under those other sections? Or did they somehow waive it just because the judge ruled against them? I thought the argument always was that Barrett was a fiduciary or aided and abetted a fiduciary. That was the pleading, aided and abetted a fiduciary breach. So your view is, at this point, they waived their other claims. Waived. But I would argue in the alternative that Judge Thompson, in her decision, she ruled that Barrett was entitled to reasonable compensation. So we're talking just now about the commissions, right? And the claim there is an equitable claim for disgorgement. As part of her ruling, the court relied on the statute. Okay. If this is rule 1106, if this suits under 1106B, that's one thing. If there was actually a claim under 1104 or 1106A, it's different. I mean, 1106A has to do with payments that are not allowed out of the plan's assets to a party in interest. Right. And if they made that claim and it was preserved, then we've got a whole bunch of other issues. Yes, we do. I would suggest it was not preserved, Your Honor. But I would also suggest that the court implicitly, in her detailed findings of facts, suggested that Barrett was entitled to reasonable compensation pursuant to 1108. And there is the reason. 1108? I thought it was 1108. Let me. 1108. 1108. Yes. 1108. 1108, Your Honor. I thought you said A. 1108. As you know, there's another issue underlying all this, which is the split in the circuits as to whether a fiduciary itself can accept reasonable compensation. I would suggest to the court that you need not reach that issue because of how clearly Renfro would seem to apply to the court's ERISA decision, the court's ERISA decision. See, can I ask you about ‑‑ I know that there was a holding as well about certain plaintiffs' claims being time-barred, the ERISA claims. Yes, Your Honor. And you cite to this one section that alerted the plaintiffs to Tricor. But how does that ‑‑ I mean, there's actual knowledge necessary. How does that deal with your client? Your client's not named in that passage. I mean, in the disclosure document that they signed? Yeah. That, of course, was based on the court's ruling that Barrett's liability was premised solely on Tricor's violation. But I don't see anything about Barrett in that passage. That's correct, Your Honor. It's all about Tricor. But what Judge Thompson said in her post-trial opinion was that it was the ‑‑ the claim is against Tricor under B. The claim that the violation of ERISA, she found, was as to the fiduciary, which Tricor was. And Barrett's liability was secondary. Well, he was a participant. Right. However you want to call it. And she found that because they had all ‑‑ you know, in that 9, 10 years before a suit was filed. Well, what evidence establishes that the appellants gained actual knowledge of Barrett's knowing participation in Tricor's breach under 406B3? Well, the document discloses and is signed by the business owners the fact that Tricor was receiving premium. I'm sorry, commission, as a result of the sale of insurance in conjunction with the plant. Every one of the plaintiffs understood the relationship between Barrett and Tricor. Those were the same facts upon which the court decided the liability aspect. In other words, they worked together. They were aware of that. But again, Judge Thompson found that the ERISA violation related solely to Tricor, the fiduciary. Could you talk a little bit about the preemption issue and the fact that the asserted or alleged misrepresentations or false representations by Barrett are preempted in light of the fact that it seems like the representations that he was making had nothing to do with the administration of an ERISA plan? Your Honor, first of all, you know, in our brief we point out that when the appellate division in New Jersey years ago in the related Findren case made its ruling, the only claim in the pleadings before it was the tax theory. The reason that the other claims are preempted is the nature of the claim itself. For example, the separate fund theory, which Judge Thompson found to be without any merit whatsoever because the plan document, the plan adoption agreement directly attacked it. But in any event, on preemption, it was necessary to examine the plan documents to answer the question as to this business about an alleged reserve fund. She found that claim to be totally without any merit, having heard all the testimony, because she read the plan document, which controls. The plan document stated unequivocally, unambiguously, that there was no right to the contributions after they were made. Now, this business about a separate fund did not relate, frankly, to the evidence at trial. So the point is that the district court did not find that there were misrepresentations or any representation concerning a reserve fund? And it was properly part of the ERISA case, Your Honor, because it required an examination of the plan documents. It was not preplanned. They were talking about the architecture of the plan itself was necessary to examine that issue, similarly with the commissions. I mean, part of the ERISA decision was a claim for disgorgement of the commissions. They wanted the commissions back, alleging that the plan had paid the commissions. In the end, I mean, wasn't that the overall plan, to have a life insurance program as well as a reserve fund? Your Honor, it's very clear. Wasn't that the underpinning of this plan? Yeah, but that is what happened. As you know, there were two classes of policies. The business owners got the better policy. The business owners got the policy where the insurance company set aside conversion credits, which were then credited to their converted policy. That was all explained by the underwriter from the insurance company, so that when the contributions went to the insurance company, they sent millions of dollars of life insurance policies funding the plan's death benefit to the plan, and at the same time, within the insurance company, funded these conversion credits. What happened later? The business owners themselves, not the rank and file, had the right to convert to an individual policy when the plan was terminated, and when those individual life insurance policies were issued by Commonwealth, cash was infused into those policies by way of cash value. So that was the fund that had been discussed between the plaintiffs and Mr. Barrett. We went over that in the evidence. The judge heard all that, and one of the judge's findings, which is absolutely correct, is that the fund, the employee benefit plan, did not lose anything. All of the benefits associated with that plan were paid, and she also found as part of her ERISA decision that the commissions were paid by the insurance company, and the insurance company representative testified that their payment of commissions as a business practice, as an ordinary business practice, did not diminish in any way the benefits that were provided to the plan via the policy. Okay. Mr. Leesburg, we've got you over a little bit, about two minutes. Let's go back to Mr. Lambos. I'm sorry, Mr. Fram. Yes, Your Honor. Renfrew did not hold that Harris Trust liability is not allowable under 406B. It didn't address the issue. We did assert, Judge Rastani, a claim under 404. That claim was addressed by the district court in her June 2010 oral opinion. That's in the joint appendix at page 57. And we believe, as noted in our brief, that the grounds for rejecting that claim were incorrect. That claim that Barrett and TriCorp failed to disclose the nature of the program, that there was no reserve fund, and that commissions were being paid on the 80% portion of the contributions, that was the claim we pursued, and Judge Thompson denied summary judgment on that claim in 2007. That's at the joint appendix at 18 to 19. Counsel argued that the commissions paid were standard in the industry. They may have been standard, but the plaintiffs here didn't know that they were purchasing insurance policies with 100% of their contributions. They thought 80% was going to a reserve fund. And, again, the primary claim here is that if they'd known that, as Judge Wendt, as you pointed out, accurately, they never would have gotten involved in this entire program. The understanding of three of the plaintiffs is that Barrett was probably getting 5% to 10% as commissions of the 20% contribution that's going to the term group life insurance. We do the math. That's 1% to 2% as a commission. They felt that that would not have been unreasonable. The fourth plaintiff, the Lima Classic plaintiffs, they had hired Barrett on a flat fee basis, and they didn't believe he was getting any commissions whatsoever. Did you do anything with 1106A? Your Honor, we did not pursue 1106A, but I do note that 1106A1D would be an alternative ground to affirm liability. We didn't pursue it, but 404, absolutely, Your Honor. Can I ask you another question? On disgorgement, if we agree with you on disgorgement, you also raise an issue about 406B1. But as a practical matter, in terms of us reaching issues, do we have to even reach that? Because you get everything you would have gotten anyway, right? You don't have to get to 406B1 if you rule in our favor on 406B3 and reject the statute defense, or if you rule under 404 in our favor. Right. Absolutely, Your Honor. Okay. Counsel commented, I think, that Judge Thompson's ruling with respect to exclusion of commissions was based upon the rules of evidence. No. It was Rule 50A, and we submit that there was a lot of evidence, overwhelming evidence, that these commissions were absolutely unreasonable. There's no question they were not disclosed. As I mentioned, the plaintiffs anticipated that it would be 1 to 2 percent. You've got the value, the time that Tricor and Barrett put into this, a matter of hours. All the facts we submit were sufficient for the jury to get that issue. It's not common for, I guess, insurance agents to disclose commissions, is it? Beg your pardon? It's not common for insurance agents to go around disclosing commissions. It's required under ERISA. It's not common if I go out and buy life insurance, but if I set up an ERISA plan. So at this point he is an ERISA fiduciary. Well, no, Your Honor, no. But 8424 does require, did require Tricor at the inception of this transaction to disclose, and this goes back to Barrett knowing that Tricor had an obligation. Again, if you buy insurance generally, no, but ERISA is different, and this is what goes back to privy to transaction exemption, 8424. And the last point I'll make is that I think counsel said that we didn't object to Judge Thompson's failure to give certain charges on RICO. Absolutely wrong. We objected very, very strongly to the exclusion of the commission issue, to her failure to charge the jury that Barrett and Tricor were fiduciaries. I think that's in your brief. Yes. Thank you very much. Mr. Friend, thank you very much. All right. Thank you for your very able arguments. We'll take the case under advisement.